January Term, 1861.

MOAK et al.
v.
BOURNE.

---

## MOAK and another vs. BOURNE.

Where the owner of a saw-mill with the necessary articles and implements for running it, and also a lot of lumber and logs, mortgaged the lumber, logs and other personal property to secure certain debts, and after a default, leased his mill to the mortgagees upon an agreement that they were to run it, saw the logs and sell the lumber, and after paying expenses, pay the mortgage debts, and that the interests of the mortgagees, as fast as the debts were paid, should cease, and after they were all paid the property remaining should belong to the mortgagor; and while this agreement was in force, the mortgagees sold the property remaining, at public auction, but bid it off themselves, and then took another lease of the mill for which they were to pay nothing,

but were to saw the logs and apply their proceeds upon the mortgage debts: January Term,
*Held*, that after the debts were paid, the personal property remaining be-
longed to the mortgagor.

It is not error in such case, in holding the mortgagees to an acccount, to allow
the mortgagor to show the value of the lumber sold by them; though if they
acted in good faith and with reasonable care, they are accountable only for the
amounts actually received from sales.

Where the question is as to the value of certain lumber, and there is a dispute
about its quality, the parties may show the value of several qualities at differ-
ent mills in the neighborhood, so that the jury may apply the evidence after
determining the quality of the particular lumber.

Where, in an action to recover possession of various articles of personal property,
it appears clearly that a part of the property belonged to the plaintiffs, though
all the rest might belong to the defendant, and the verdict was for the de-
fendant generally as to all the property, if the court refuses a motion for a
new trial on the ground that the verdict was against evidence, the judg-
ment will be reversed.

1861

Moak et al.
v.
Bourne.

APPEAL from the Circuit Court for *Jefferson* County.

The case is stated in the opinion of the court. Judgment
in the circuit court for the defendant, and motion for a new
trial denied.

*Enos & Hall*, for appellants:

Upon default in payment of the debt secured by the chat-
tel mortgage, the legal title to the mortgaged property vested
absolutely in the mortgagees. Neither the subsequent agree-
ment nor their failure to comply with it, would revest the
mortgagor with the title. 8 Johns., 96; 7 Cow., 290; 6
Shipley, 356; 12 Wend., 61; 2 Denio, 170; 1 Chand., 203.
2. The court erred in admitting testimony as to the general
value of lumber, and as to the general cost of manufacturing
lumber. 3. The verdict was against evidence, at least in
regard to the yoke of cattle replevied.

*Gill, Barber & Fribert*, for respondent:

1. The evidence as to the value of lumber and cost of
manufacturing it, was properly admitted for the purpose
of showing that the plaintiffs were not faithfully discharging
their duty as trustees for the defendant. 2. The legal title
to the mortgaged property did not remain in the mortgagees
after default, under the subsequent written agreements.
These must be considered in determining the rights of the
parties. 1 Greenl. Ev., § 283; 6 Wis., 71. The sale by the
mortgagees (as trustees) to themselves, did not change the

legal rights of the parties. Burrill on Assignments, 455 et seq.; 4 Kent, 475; 4 Abbott's Pr. R., 112; Story on Bailments, 319. See also *Charter vs. Stevens*, 3 Denio, 33; Willard's Eq. Jur., 457–8; *Patchin vs. Pierce*, 12 Wend., 62; *Parks vs. Hall*, 2 Pick., 211; *Leitch vs. Hollister*, 4 Coms., 211.

April 10.

*By the Court,* PAINE, J. This was an action to recover possession of personal property. The facts material to an understanding of the question presented may be briefly stated as follows: *Bourne*, the defendant, was the owner of a saw mill, and personal property used in operating it, and also of a quantity of lumber and logs. He gave a chattel mortgage upon the personal property, among which was a yoke of oxen, to secure the payment of several notes and debts mentioned in the mortgage. After a default by the mortgagor, the parties made a further agreement, by which he leased his mill to those interested in the debts, and they were to run it, saw the logs, sell the lumber and apply the proceeds, first to expenses, and next to the payment of the debts in the order in which they were mentioned in the mortgage. This agreement, which was made in August, 1858, provided that if enough of the lumber should not be sold by the 1st of the following January, to pay the indebt-'edness, it might then, on six days' notice, be sold at public auction to the highest bidder,' and the proceeds applied to the expenses, and then to the debts. It also provided that the interest of each of the creditors should cease as soon as he was paid off, and that in case of a sale at public auction, the balance, after paying the indebtedness, should revert and belong to the mortgagor. Under this agreement the mortgagees took possession of the mill and personal property. While they were in possession, *Bourne* signed a paper giving them the right to sell at public auction at any time, without waiting till the first of January, 1859, and waiving the six days' advertisement; the sale, however, to be for cash, or short approved paper. After running the mill awhile, the mortgagees caused such sale at auction to be made, but they bid off most of the property. After this a further lease of the mill was made by *Bourne* to them, upon an

agreement that they were to pay nothing for the use of it,
but were to use it in sawing logs which had been bid off by
them, and that the proceeds should still be applied to the
mortgage debts.   With this understanding the mortgagees
continued in possession, manufacturing and selling lumber,
until the mortgagor, claiming that they had realized enough,
over and above expenses, to pay off the mortgage debts,
took possession of the property.   And the plaintiffs, who
had acquired the entire interest of the mortgagees, brought
this action to recover the personal property.

The first question is, whether, supposing the mortgagees
to have sold enough to pay themselves, over and above ex-
penses, the mortgagor was entitled to the balance.   We
think he was.   The counsel for the appellants relied upon
those cases which hold that after default the interest of a
chattel mortgagee becomes absolute.   But we think that prin-
ciple not strictly applicable here, for the reason that here is
not only a chattel mortgage, but other agreements by the
parties, upon which their rights materially depend.   Taking
all these written agreements in connection with the parol
evidence upon the same point, we think they show an un-
derstanding that the mortgagees were to get their debts out
of the property by using the mill for that purpose, and that
their interest was then to cease, and the remainder to be-
long to the mortgagor.   This is expressly provided for in the
first lease, and the mortgagees testify that such was the un-
derstanding.   The last lease, in speaking of the logs as hav-
ing been bid off by the mortgagees, and being then owned
by them, might serve to throw some doubt upon this point
at that time, but we think the provisions of the lease itself
show conclusively that the parties still had the same inten-
tion which had pervaded their entire agreements upon the
subject.   The mortgagees were to pay nothing for the mill,
and were to apply the proceeds of the lumber sawed from
these logs upon the mortgage debts.   It is incredible that
such an agreement could have been made, except upon a
continuation of the idea that they were to get only their
debts out of the property, and that the balance was to be-
long to the mortgagor.   There was no other consideration

for the lease of the mill. We think, therefore, the court below properly held, that if they had paid themselves, the balance belonged to the mortgagor.

Nor do we think it was erroneous for the court to allow the mortgagor to show the value of the lumber disposed of by the mortgagees. It is true the point of inquiry for the jury was, what amount they had realized from sales, over and above expenses. If they acted in good faith and with reasonable diligence in making the sales, that was all they were accountable for. Showing the value of what they had sold, would be a circumstance from which the jury might infer what they had received. If the mortgagees, by their testimony, could fix the amount more specifically, the jury, if satisfied that they acted in good faith, should charge them only with that amount. But evidence of the kind offered by the mortgagor was, perhaps, the only kind which, from the nature of the case, was accessible to him in the first instance, with the exception of calling the other parties, which though he might, still he was not bound to do.

Nor was it error to allow the mortgagor to show the value of the several grades of lumber at other mills in the vicinity of this, though a few miles distant. It is true such testimony did not apply directly to this lumber. But where an article is divided into several qualities and has established market prices, like lumber, if there is a dispute about the quality of the lumber in question, it would seem admissible to prove the market price of any of the qualities which the jury might find it to be, and leave them to apply the evidence accordingly. And it would be for the jury to say, from the evidence as to the quality and that as to the value of the various qualities there and in that vicinity, what was the value of that particular lumber.

The counsel for the appellants contends, that the verdict was against evidence, and that the court below erred in overruling the motion for a new trial. Without expressing any opinion upon the evidence generally, we think the verdict was against the evidence in one respect. It appears, beyond any question, that the yoke of cattle replevied did not belong to the mortgagor. He himself testified, that of the yoke

originally mortgaged, one died, and he sold the other before the mortgagees took possession. It appears that the new yoke was purchased by them while in possession, and that they never belonged to *Bourne.* The verdict makes no distinction between them and the rest of the property, but delivers them with the rest to the mortgagor. This was probably because no point was made upon it at the trial, as it was doubtless overlooked in the heat of the controversy upon the more important points in the case. Still the objection that the verdict was against evidence is sufficient to enable the appellants to take advantage of it here. The respondent's counsel answers this objection by saying that the proof shows that *Bourne* had really been charged with these cattle, under the head of expenses, and if not, that it shows that they belong to *Moak* alone, and not to the appellants jointly. But we think neither of these facts appears. J. J. Moak swears that he bought the cattle for the mill company, and that they were never charged to *Bourne.* It is true, he says he bought them with *W. T. Moak's* money, and upon his evidence the money should be regarded as advanced by *W. T. Moak* for the company.

For this reason, therefore, we think the judgment must be reversed, with costs, and a new trial awarded.